

222 Delaware Avenue • Suite 900
P.O. Box 25130 • Wilmington, DE 19899
Zip Code For Deliveries 19801

Writer's Direct Access:
(302) 429-4232
Email: sbrauerman@bayardlaw.com

July 8, 2014

**BY CM/ECF & HAND DELIVERY**

The Honorable Leonard P. Stark
Chief United States District Judge
United States District Court for the District of Delaware
844 North King Street
Wilmington, DE 19801

Re: *Walker Digital, LLC v. Google, Inc., et al*, C.A. No. 11-318-LPS

Dear Chief Judge Stark:

Pursuant to the Court's June 24, 2014, Order, Walker Digital, LLC ("Walker Digital") respectfully submits this supplemental letter brief to address the impact of *Alice Corp. v. CLS Bank Int'l*, 573 U.S. __, No. 13-298, 2014 U.S. LEXIS 4303.

Plaintiff agrees with Google Inc. ("Google") that the Supreme Court confirmed the two-step analysis described in *Mayo Collaborative Servs. v. Prometheus Labs. Inc.*, 566 U.S. __ (2012). (*See* D.I. 306 at 1.) The first step in the analysis is to "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 2014 U.S. LEXIS 4303, at *17. Only if the Court determines that the claims at issue are directed to an abstract idea does a Court reach the second step of the *Mayo* analysis. *Id.* at *22. Under the second step of the analysis, courts look at the claims that recite an abstract idea and determine if there are sufficient "'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* (quoting *Mayo*, 2012 U.S. LEXIS 2316, at *19-20).

Before embarking on its Section 101 analysis in *Alice*, the Supreme Court began by emphasizing the caution with which courts should proceed when considering Section 101 issues: "we tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* at *15. The Supreme Court was careful to state that "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* (citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)). "'Applications' of such concepts 'to a new and useful end' . . . remain eligible for patent protection." *Id.* (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

**I. The Asserted Claims of the Patents-in-Suit Cover Only New and Useful Narrow Systems and Processes Relating to Communications Technology Involving the Controlled Release Of Information.**

Under the first step of the two-step *Mayo* analysis, the Court must determine whether each asserted claim of the patents-in-suit claims an "abstract idea." *Alice*, 2014 U.S. LEXIS 4303, at *17-18. In *Alice*, the Court explicitly stated that its opinion does not "delimit the precise contours of the 'abstract ideas' category . . . ." *Id.* at *21-22. An examination of the two most





recent opinions on the topic of abstract ideas, however, provides guidance; an abstract idea is the fundamental, well-known concept underlying the described invention. At issue in both *Bilski* and *Alice* were claims that were "drawn to . . . '***fundamental*** economic practice[s] long prevalent in our system of commerce.'" *Id.* at *19-20 (quoting *Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218, 3231 (2010)) (emphasis added). In *Bilski*, the Supreme Court addressed the fundamental economic principal of hedging risk. *Bilski*, 130 S. Ct. at 3229 (the claims at issue sought "to patent both the concept of hedging risk and the application of that concept to energy markets"). In *Alice*, the claims were "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk." *Alice*, 2014 U.S. LEXIS 4303, at *19-20. The Supreme Court found the patents in both *Alice* and *Bilski* to be problematic because the claims were "drawn to . . . '***fundamental*** economic practice[s] long prevalent in our system of commerce.'" *Id.* at *19-20 (quoting *Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218, 3231 (2010)) (emphasis added).

Here, the fundamental concept underlying the '270 and '272 patents is the controlled release of sensitive or confidential information between two parties. ('272 patent at 1:12-14 ("the invention relates to controlling the release of confidential or sensitive information of at least one of the parties"); 4:10-12 ("there is a need for system that allows users to exercise control over the release of information to others").) The specification of the patents-in-suit describes preferred embodiments of a controlled communications system. (*See e.g.*, '272 patent at 4:19-27.) As will be discussed in more detail below, the patents-in-suit claim very specific, technological improvements for the performance of certain narrow forms of controlling the release of information.

According to Google, the asserted claims of the patents-in-suit are drawn to an abstract concept "of using an intermediary to facilitate controlled communication or exchange of information between two anonymous parties." (D.I. 306 at 2.) Google's proposed abstract idea is problematic for two reasons. First, Google's proposed abstract idea is nothing more than an over-simplified summary of the claims of the '270 patent. Google's overly narrow proposal cannot be the abstract idea because it does not address the concept underlying the '272 patent, which is not limited to anonymity. Second, Google's proposal does not comply with the analytical framework set forth in *Alice* and *Bilski*. It does not capture the fundamental concept at the center of the inventions claimed in the patents-in-suit. Instead, at best, it is an oversimplification of some of the claim limitations of the '270 patent. The fundamental concept is, as described by Walker Digital above, the controlled release of information. Because the asserted claims of the patents-in-suit do not cover "the controlled release of information," the '270 and '272 patents do not claim a fundamental "abstract idea."

## II. The Patents-In-Suit Satisfy §101 Because They Do Not Preempt An Abstract Idea And They Teach Specific Technological Improvements.

After identifying an abstract idea, the next step is to determine whether there are sufficient "'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Alice*, 2014 U.S. LEXIS 4303, at *22 (quoting *Mayo*, 2012 U.S. LEXIS 2316, at *19-20). The Supreme Court appears to offer two analyses to determine if the second step is satisfied: preemption and the determination of whether claims teach technological improvements on the abstract idea. *Alice*, 2014 U.S. LEXIS 4303, at *14 ("We have described the concern that drives [§ 101's] exclusionary principle as one of pre-emption."); *id.* at *26 (finding that "the claims in *Diehr* were patent eligible because they improved an existing technological process, not because they were implemented on a computer"). Even, assuming *arguendo*, the patents-in-suit were found to be directed to an abstract idea, the patents-in-suit satisfy both of these analyses.

**A. The Claims Of The Patents-In-Suit Do Not Preempt An Abstract Idea.**

Preemption of an abstract idea is a key to the Supreme Court's recent §101 jurisprudence. In *Bilski*, the Supreme Court was cognizant of the "wide-ranging and unforeseen impacts" a formulaic approach to a section 101 analysis utilizing "categorical rules" might cause. *Bilski*, 130 S. Ct. at 3229. Instead, the Supreme Court in *Bilski* "resolve[d that] case narrowly on the basis of [the] Court's decisions in *Benson*, *Flook*, and *Diehr*." *Id.* After discussing those decisions, the Court concluded that "[a]llowing petitioners to patent risk hedging would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 3231. Similarly, in *Alice*, the Supreme Court also noted the "pre-emption concern that undergirds [its] § 101 jurisprudence" when describing the insufficiency of simply applying an abstract idea with a computer. *Alice*, 2014 U.S. LEXIS 4303, at *26-27.

Here, unlike in *Bilski* and *Alice*, the scope of the asserted patents does not cover an entire fundamental abstract concept. Indeed, the lack of preemption is illustrated by the claims themselves. The claims of the patents-in-suit claim two, highly specific implementations of the general concept of controlled communications. For example, the independent claims of the '270 patent cover a specific application involving the use of at least two party-provided rules, where at least one of the rules protects a party's identity, and a specific ordering as to how information is released. The '272 patent covers a different specific application of the generalized concept of facilitating controlled communications. For example, the independent claims of the '272 patent claim the use of at least one party-specified rule (without any limitation on the type of rule being provided by the party) as well as the ability to search for other parties using search requests. The dependent claims of the patents-in-suit describe applications with even further specificity. Claim 2 of the '272 patent, for example, includes a limitation that authorship of said first party information data is authenticated. Claim 3 of the '272 patent further adds that "wherein the step of authenticating includes the substep of executing a cryptographic key." Claims 10 and 11 of the '270 patent require that the party rules are conditional on the content of the other party's data.

Additionally, as discussed in Walker Digital's reply to Google's motion for partial summary judgment, there are multiple examples of computer systems facilitating anonymous communications that fall outside the scope of the claims of the patents-in-suit. (D.I. 281 at 8) (examples include systems of providing anonymous communications between parties without using search criteria and websites that allow anonymous commenting, which is often included at the bottom of online news articles).

Accordingly, the '270 and '272 patents comply with §101 because, unlike the claims at issue in *Bilski* and *Alice*, the asserted claims do not preempt fundamental concepts and the claims do not confer a patent of the entire concept of controlled communications to Walker Digital.

B. **The Asserted Claims Improve an Existing Technological Process.**

The second step in the *Mayo* analysis, as applied in *Alice*, again looks to ensure that a claim reciting an abstract idea does not "monopolize the abstract idea." *Alice*, 2014 U.S. LEXIS 4303, at *22 (quoting *Mayo*, 2012 U.S. LEXIS 2316, at *19-20). Claims, however, that "improve[] an existing technological process" are patentable even if they are implemented on a computer. *Id.* at *26. This analysis appears to be another way to consider the preemption analysis. *Diehr*, 450 U.S. at 187 (patentee did not "seek to pre-empt the use of that equation").

The best example of this analysis is *Diamond v. Diehr*, 450 U.S. 175 (1981). In *Diehr*, the claims covered "a process for curing synthetic rubber" that "employ[ed] a well-known mathematical equation." *Id.* Although the claims included an abstract idea (a well-known mathematical equation), the Supreme Court found that the claims at issue met §101 because the claims did "seek to pre-empt the use of that equation." *Id.* In particular, the patent in *Diehr* introduced the use of a computer to improve the existing technology process of curing rubber. *Id.* ("if the computer use incorporated in the process patent significantly lessens the possibility of

'overcuring' or 'undercuring,' the process as a whole does not thereby become unpatentable subject matter"); *Alice,* 2014 U.S. LEXIS 4303, at *25-26 (distinguishing *Diehr* because the introduction of a thermocouple and a computer was an improvement on an existing technology process).

Here, like in *Diehr*, the asserted claims of the '270 and '272 patents provide a specific technical solution to a known problem. Controlled communications prior to the patents-in-suit typically relied on a trusted middleperson who knew each party's confidential information and would only reveal such information to the anonymous parties under special circumstances. (D.I. 281 at 4.) Understandably, this was not only inefficient, but also untrustworthy. (*Id.*) The inventions of the patents-in-suit addressed the need for a process of utilizing technology to achieve direct, party-to-party communication without the need for a human middleman. The invention provides technological improvements on the old system by using a trustworthy middleman (a computer), allowing for faster and better access to more stored information (through search requests) and for specific sequences of utilizing user-defined rules to actively make determinations on what information to transmit and to whom. (*See also, e.g.*, '270 patent at 4:67-5:4 (the inventions disclosed in the '270 and '272 patents "allow[] for new improvements in the quality of the communication process when one party in the process would suffer significant costs or be exposed to significant risks" if his or her confidential information is released without permission.).)

Accordingly, much in the same way the patents at issue in *Diehr* incorporated known equipment and a mathematical formula to arrive at a patentable invention to improve rubber curing technology, the systems and processes of the asserted claims incorporate known technology into specific systems and processes that significantly improve controlled communication technology by lessening the possibility of inadvertent disclosure of sensitive information to unintended recipients. Therefore, the asserted claims of the '270 and '272 patents do not become unpatentable under Section 101 simply because they may include known computer components.

## III. Google Attempts to Improperly Conflate the Section 101 Patent-Eligible Subject Matter Analysis with the Section 103 Non-Obviousness Analysis.

Google argues that the purpose of eliminating a human middlemen "is not 'enough' to transform an abstract idea into a patent-eligible invention." (D.I. 306 at 5.) This argument misses the mark. Google relies on the language from *Alice* that clarifies that an abstract idea (*i.e.*, a fundamental concept preemptive of the entire concept) is not patent eligible solely because the claims require the use of a computer. (*Id.*) First, Google is wrong because, as discussed above, the asserted claims cover specific applications of the general concept of facilitating controlled communications through specific systems and processes; they do not preemptively cover the entire abstract idea.

Second, Google's argument is flawed because it conflates the Section 101 analysis with the Section 103 non-obviousness analysis. Throughout Google's supplemental letter brief, it oversimplifies the requirements of the asserted claims in an effort to characterize the inventions of the '270 and '272 patents as obvious. (*See, e.g.*, D.I. 306 at 4 ("each step of the process . . . is purely conventional;" "the conventional steps of . . . decrypting data using a cryptographic key"); *id.* at 5 ("[v]iewed as a whole, the method claims at issue simply recite the concept of intermediated exchange of information between parties based on rules as performed by a generic computer;" "the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated communications between anonymous parties using some unspecific, generic computer").)

"The question . . . of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'" *Diehr*, 450 U.S. at 190 (quoting *In re Bergy*, 596 F.2d 952, 961 (CCPA 1979). Whether or not a claim satisfies the

novelty requirement under § 102 or the non-obvious requirement under § 103 "does not affect the determination" of claims under a § 101 analysis. *Diehr*, 450 U.S. at 191. As discussed above, the relevant inquiry under § 101 is whether the claims at issue claim an abstract idea. As *Diehr* makes clear, the combination of known hardware and a computer in a novel and non-obvious way is patentable under § 101. Google inappropriately conflates the § 101 analysis with an obviousness analysis under § 103 by painting the asserted claims of the patents-in-suit as nothing more than a commonly understood idea applied using generic hardware in an effort to establish invalidity under Section 101. (D.I. 306 at 4-5.)

Not only is Google's conflation of the § 101 and § 103 analyses inappropriate, but Google points to no evidence in the record establishing that methods and systems for facilitating anonymous communications in the manner required by the patents-in-suit were known or would have been obvious to a person of ordinary skill in the art at the time of the inventions. If Google is unable to identify evidence in the record to support an invalidity defense based on obviousness, its unsupported generalizations that the asserted claims of the patents-in-suit were commonly understood ideas should not be accepted for the purposes of summary judgment of invalidity under a § 101 analysis.

Because the claims of the '270 and '272 patents solve a technological problem using specific processes and systems rather than preempting an entire abstract idea, the asserted claims are patentable subject matter. The Supreme Court's recent decision in *Alice* confirms this analysis. Accordingly, Plaintiff respectfully requests that the Court deny Google's motion for summary judgment as to invalidity of the patents-in-suit based on 35 U.S.C. § 101.

Respectfully submitted,

/s/ Stephen B. Brauerman

Stephen B. Brauerman (sb4952)

SBB:tm
cc: All Counsel