# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

WALKER DIGITAL, LLC,                           :
                                           :
  Plaintiff-Counterdefendant,        :
                                           :
   v.                            :  C.A. No. 11-318-LPS
                                           :
GOOGLE, INC.                                   :
                                           :
  Defendant-Counterplaintiff.        :

---

Richard D. Kirk, Stephen B. Brauerman, Vanessa R. Tiradentes, Sara E. Bussiere, BAYARD, P.A., Wilmington, DE

Marc A. Fenster, Andrew D. Weiss, RUSS, AUGUST & KABAT, Los Angeles, CA

  Attorneys for Plaintiff Walker Digital, LLC

Richard L. Horwitz, David E. Moore, Bindu A. Palapura, POTTER, ANDERSON & CORROON LLP, Wilmington, DE.

Jeannine Yoo Sano, Eric Lancaster, WHITE & CASE LLP, Palo Alto, CA
Jason Liang Xu, James Gagen, WHITE & CASE LLP, Washington, DC
Kevin X. McGann, WHITE & CASE LLP, New York, NY

  Attorneys for Defendant Google Inc.

---

## MEMORANDUM OPINION

September 3, 2014
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is Defendant Google, Inc.'s ("Google" or "Defendant") motion for summary judgment of invalidity of U.S. Patent No. 5,884,270 ("the '270 patent") and U.S. Patent No. 5,884,272 ("the '272 patent") for lack of patentable subject matter. (D.I. 250) The parties completed briefing on May 7, 2014. (D.I. 289) The Court held oral argument on August 26, 2014. (*See* Transcript ("Tr.")) For the reasons discussed below, the Court will grant Defendant's motion.[1]

## BACKGROUND

Plaintiff Walker Digital, LLC ("Walker" or "Plaintiff") filed this case against Google and several other defendants on April 11, 2011. (D.I. 1) Walker subsequently entered into license agreements with all defendants except Google. (*See* D.I. 4, 19, 34, 37, 72, 95, 224) Google filed its answer and counterclaims against Walker on July 15, 2011. (D.I. 38) The Court construed certain claim terms of the patents-in-suit on July 25, 2013. (*See* D.I. 231, 232) The parties have completed fact and expert discovery. (*See* D.I. 233) No trial date has been set. (*See* D.I. 52 ¶ 20)

Walker asserts that Google infringes independent claims 1 and 23 and dependent claims 2, 5, 10, 11, 24, 27, 32, and 33 of the '270 patent, as well as independent claims 1 and 65 and dependent claims 2-4, 9-11, 19, 27, 28, 31, and 32 of the '272 patent. (D.I. 105 at 1 n.1) Both patents contain nearly identical specifications, were filed September 6, 1996, and issued on March 16, 1999. (D.I. 100 Ex. A, B)

The '270 patent is entitled "Method and System for facilitating an employment search

---

[1]Other motions filed by both sides are also pending and will be denied as moot.

incorporating user-controlled anonymous communications." The '272 patent is entitled "Method and System for establishing and maintaining user-controlled anonymous communications." The patents relate generally to "controlling the release of confidential or sensitive information of at least one of the parties in establishing anonymous communications." ('270 patent col. 1:11-14; '272 patent col. 1:11-14)

Google contends that the asserted claims of the patents-in-suit are invalid under 35 U.S.C. § 101 due to lack of patentable subject matter because the claims are directed at "a purely mental process that could be performed without the aid of a computer." (D.I. 251 at 6) According to Google, the "claimed invention is directed to nothing more than the abstract idea of an exchange of information about people, long practiced by human matchmakers, simply appended to a general computer system to accelerate the process." (*Id.*) Google essentially argues that "[t]his is similar to the kind of 'organizing human activity' at issue in, [and found unpatentable by], *Alice.*" *Planet Bingo, LLC v. VKGS LLC*, 2014 WL 4195188, at *2 (Fed. Cir. Aug. 26, 2014) (citing *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014)).

Walker responds that Google's arguments lack merit. According to Walker, the Court may only find the patents invalid for lack of patentable subject matter if the patents preempt the entire idea of "controlled information exchange between anonymous parties." It follows, in Walker's view, that if it is possible to engage in "controlled information exchange between anonymous parties" in a manner that does not infringe the patents-in-suit, then the patents are not invalid for lacking patentable subject matter. (Tr. at 39-41)

2

## LEGAL STANDARDS

### I.  Motion for Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory

3

allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## II.    Lack of Patentable Subject Matter

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Pertinent here is the third category. "The 'abstract ideas' category embodies the longstanding rule that an idea of itself is not patentable." *Alice*, 134 S. Ct. at 2355 (internal citations omitted). "As early as *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852), the Supreme Court explained that '[a] principle,

4

in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.' Since then, the unpatentable nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 977-78 (Fed. Cir. 2009).

In *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must determine if the claims at issue are directed at a patent-ineligible concept. *Id.* If so, the next step is to look for an "'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.*

"Simply appending conventional steps, specified at a high level of generality, [is] not ***enough*** to supply an inventive concept." *Id.* at 2357 (internal quotation marks omitted) (emphasis in original). In *Bilski v. Kappos*, 130 S. Ct. 3218, 3231 (2010), for example, the Supreme Court held that the claims involved were drawn to the patent-ineligible abstract idea of "hedging, or protecting against risk," which was a "fundamental economic practice." Similarly, in *Alice*, the Supreme Court found that the claims were drawn to the patent-ineligible abstract idea of "intermediated settlement," which was also a "fundamental economic practice." 134 S. Ct. at 2356. In both cases, the Supreme Court found that the additional steps delineated in the claims did not embody an "inventive concept" sufficient to ensure that the patents amounted to more than patents upon the ineligible fundamental concepts themselves.

In determining if a patent embodies such an inventive concept, courts may consider

5

whether the process "is tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3227 ("[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101."). "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decision, Inc.*, 654 F.3d 1366, 1375 (internal quotation marks omitted). To be "a meaningful limit on the scope of a claim," the addition of a machine "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). Hence, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.*

Although the "machine-or transformation test is a useful and important clue" to determining patentability, it is "not the sole test for deciding whether an invention is a patent-eligible 'process.'" *Bilski*, 130 S. Ct. at 3227. "[I]n applying the § 101 exception, [courts] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more thereby transforming them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354 (internal citations omitted). The "concern that

6

drives the exclusionary principle [i]s one of pre-emption." *Id.* That is, where a "patent would

pre-empt use of" basic tools of scientific and technological work, *i.e.*, laws of nature, natural

phenomena, and abstract ideas, the patent would "impede innovation more than it would tend to

promote it, thereby thwarting the primary object of the patent laws." *Id.*[2]

## DISCUSSION

### I.    '270 Patent

Claims 2, 5, 10, and 11 of the '270 patent are all method claims and all depend from the

method claim recited in independent claim 1. Claims 23, 24, 27, 32, and 33 are all system claims

that are directly analogous to the methods recited in claims 1, 2, 5, 10, and 11.

Independent claim 1 recites as follows:

> 1.    A method for operating a computer system to
> facilitate an exchange of identities between two
> anonymous parties, comprising the steps of:
>
> receiving from a first party first data including an
> identity of said first party;
>
> receiving from said first party at least two first-party
> rules for releasing said first data including a rule for
> releasing said identity of said first party;
>
> receiving from a second party a search request
> comprising at least one search criterion;

_____

[2]Contrary to Plaintiff's assertion, the inquiry on preemption is not whether patents directed at "building blocks of human ingenuity" would preempt an ***entire*** field but, instead, whether such patents "would risk ***disproportionately*** tying up the use of the underlying ideas." *Alice*, 134 S. Ct. at 2354 (emphasis added); *see also Prometheus*, 132 S. Ct. at 1294 (holding that "patents [that] would . . . disproportionately t[ie] up the use of the underlying natural laws" are invalid for lacking patentable subject matter); *Gametek LLC v. Zynga, Inc.*, 2014 WL 1665090, at *5 (N.D. Cal. Apr. 25, 2014) ("A patent need not, however, preempt an entire field to run afoul of § 101; instead, the question is whether the patent 'would risk disproportionately tying up' the use of the abstract idea.").

receiving from said second party second data including an identity of said second party;

receiving from said second party at least two second-party rules for releasing said second party data including a rule for releasing said identity of said second party;

processing said search request to determine if said first data satisfies said search criterion;

and if said first data satisfies said search criterion, then exchanging said first and second data, except said identities of said first and second parties, between said first and second parties in accordance with said first-party and second-party rules, after said exchanging step, upon satisfying said first-party rule for releasing said identity of said first party, transmitting said identity of said first party to said second party, and after said exchanging step, upon satisfying said second-party rule for releasing said identity of said second party, transmitting said identity of said second party to said first party.

Dependent claim 2 recites:

2.    A method in accordance with claim 1 wherein said step of receiving from a first party at least two first-party rules includes receiving at least one first-party rule before receiving said search request and storing said at least one first-party rule.

Dependent claim 5 recites:

5.    A method in accordance with claim 1 wherein said step of receiving from said second party at least two second-party rules includes receiving at least one second-party rule before receiving said search request and storing said at least one second-party rule.

Dependent claim 10 recites:

> 10.   A method in accordance with claim 1 wherein at
>        least one of said first-party rules is conditional on
>        the content of said second data.

Dependent claim 11 recites:

> 11.   A method in accordance with claim 1 wherein at
>        least one of said second-party rules is conditional on
>        the content of said first data.

Google contends that, in each asserted claim, the claimed invention is directed to "nothing more than the abstract idea of a controlled exchange of information about people that has long been practiced by human matchmakers or headhunters." (D.I. 289 at 5) The patent specification recognizes that in the prior art, "to find potential candidates" companies would "engage an employment search firm to discretely find potential candidates without disclosing to the market, or even potential candidates, the company's identity until the company decides to confide in or hire a particular candidate." ('270 patent col. 2:42-47) Similarly, in the context of dating, "a person could serve as a match-maker by setting up two people with whom he is acquainted on a blind date." (*Id.* at col. 3:47-49) Given the prior art, the invention was purportedly necessary to create "a system that allows users to [1] exercise control over the release of information to others and [2] provides efficient anonymous communication." (*Id.* at col. 4:9-11)

Plaintiff, through the testimony of its expert, Dr. Craig Wills, asserts that the methods and systems of the '270 patent claim more than an abstract idea because the claims contain meaningful limitations, specifically requiring the following steps:

> [1] receiving party data including an identity from both a first and
> second party;

9

[2] receiving at least two rules for releasing party data, including a rule for releasing identity, from each party;

[3] receiving a search request from a second party;

[4] processing the second party's search request to determine if party data provided by a first party satisfies the search criterion used;

[5] if the data provided by the first party satisfies the search criterion of the second party's search request, the asserted independent claims require exchanging first and second party data except the identities of the first and second party in accordance with the first and second party rules for releasing their respective data; and

[6] releasing the identities of the first and second parties upon satisfying the first and second party rules for releasing their respective identities after the exchange of the non-identity first and second party data.

(D.I. 283 ¶ 12) However, none of these limitations adds anything meaningful to the basic concept of controlled exchange of information about people as historically practiced by matchmakers and headhunters – and as disclosed in the patent specification itself.[3] By contrast, all of these steps could be performed (and have been performed) by human beings interacting with one another prior to the filing of the '270 patent.

---

[3]Although Google did not present expert testimony to rebut Dr. Wills, the Court concludes that Dr. Wills' testimony raises no material factual disputes between the parties. Initially, the Court finds that Dr. Wills' analysis is largely conclusory. Additionally, Dr. Wills contends that the asserted claims cannot be performed without a computer – but, for the reasons explained in this Memorandum Opinion, even if he is correct, that does not save the patent's claims. Likewise, even accepting as true Dr. Wills' opinion that the "anonymous methods and systems claimed by the patents-in-suit were novel and unknown to those of ordinary skill in the art at the time" of the invention (D.I. 283 ¶ 15), the Court has concluded (based on evidence, including the patents' specifications) that these "methods and systems" are directed to abstract ideas and do not contain any limitations meaningfully distinguishing the claims from the prior art practices of headhunters and matchmakers.

To be meaningful, a limitation must consist of some "inventive concept;" if a patentee contends this is so on the basis that the invention incorporates a machine, the machine must "play a significant part in permitting the claimed method to be performed." On these points, a recent Federal Circuit case on patentable subject matter is instructive. In *SmartGene, Inc. v. Advanced Biological Laboratories, SA*, 555 F. App'x. 950, 951 (Fed. Cir. Jan. 24, 2014), the patent at issue claimed a method "for guiding the selection of a treatment regimen for a patient with a known disease or medical condition." Claim 1 claimed:

> a "method for guiding the selection of a therapeutic treatment regimen for a patient with a known disease or medical condition." The method (1) "provid[ed] patient information to a computing device" having routine input, memory, look-up, comparison, and output capabilities and that (2) "generat[ed] . . . a ranked listing of available therapeutic treatment regimens" and (3) "generat[ed] . . . advisory information for one or more therapeutic treatment regimens in said ranked listing."

*Id.* at 954-55. Claim 1 also included a "computing device" containing "a set of 'expert rules for evaluating and selecting' from a stored 'plurality of different therapeutic treatment regimens,' as well as 'advisory information useful for the treatment of a patient with different constituents of said different therapeutic treatment regimens.'" *Id.* at *955. The Federal Circuit concluded that this "computing device" limitation was "broad" and not meaningfully distinguishable from "a doctor's mind." *Id.* Thus, although the claimed method recited several rules ostensibly narrowing the claimed invention, the claim was held to be not patent eligible, because section 101 does not "embrace a process defined simply as using a computer to perform a series of mental steps that people, aware of each step, can and regularly do perform in their heads." *Id.* at *954, *citing CyberSource*, 654 F.3d at 1373. Yet this was all that the claims themselves

11

embraced.

Much like the "rules" listed in *SmartGene*, the additional "steps" of the claims of the '270 patent are merely "a series of mental steps that people, aware of each step, can and regularly do perform in their heads." The claim limitations essentially recite a generic headhunting or matchmaking request by two parties. There is nothing "inventive" about any of the listed rules or any other steps of the claims, including the order in which they are to be performed.[4] Instead, the claim limitations simply lay out an interaction whereby two parties share a series of demands with a third party, where one of the demands of both parties is that the parties' identities remain anonymous unless and until there is at least some overlap between the demands and requirements of the two parties.

As the following hypothetical (articulated by Google, and not meaningfully distinguished by Walker) shows, these steps can and routinely are performed by, for example, human job headhunters:

| Limitations of '270 Patent Claim 1 | Routine Steps Performed when Headhunting |
|---|---|
| "receiving from a first party first data including an identity of said first party" | Carol receives a resume from Alice, which lists Alice's college degree, 8 years of sales experience, interests, and other information, including Alice's name |
| "receiving from said first party at least two first-party rules for releasing said first data including a rule for releasing the identity of said first party" | Alice instructs Carol to disclose her education and sales experience to companies with open sales positions but not to disclose her name unless the company is offering a salary of at least \$75,000 |

---

[4]There is no dispute that the method claims for both patents can be practiced with or without a computer. (Tr. at 10-12, 36-37)

12

| | |
|---|---|
| "receiving from a second party a search request comprising at least one search criterion" | Bob asks Carol to find an employee with sales experience for his company |
| "receiving from said second party second data including an identity of said second party" | Bob tells Carol that the job at his company is a sales position that pays $100,000 in salary and that the name of his company is Bob's Software |
| "receiving from said second party at least two second-party rules for releasing said second party data including a rule for releasing said identity of said second party" | Bob instructs Carol that she can disclose information about the job opening to any applicant with sales experience and that she can provide the salary offer to any applicant with a college degree but not to disclose the name of his company unless the applicant has more than 5 years of sales experience |
| "processing said search request to determine if said first data satisfies said search criterion" | Carol checks to see if Alice has the necessary sales experience requested by Bob |
| "if said first data satisfies said search criterion, then exchanging said first and second data, except said identities of said first and second parties, between said first and second parties in accordance with said first-party and second- party rules" | Once Carol determines that Alice has the necessary sales experience for Bob, Carol provides Alice's college degree and years of sales experience to Bob, but not Alice's name, and provides information to Alice about the sales position available at Bob's company and the salary information, but not the name of Bob's company, in accordance with Alice's instructions and Bob's instructions |
| "after said exchanging step, upon satisfying said first-party rule for releasing said identity of said first party, transmitting said identity of said first party to said second party, and after said exchanging step, upon satisfying said second-party rule for releasing said identity of said second party, transmitting said identity of said second party to said first party" | After Carol provides Alice's sales experience and college degree to Bob and provides Bob's salary offer and sales position available at Bob's company to Alice, Carol gives Alice's name to Bob upon determining that Bob's company is offering at least $75,000 in salary and tells Alice the name of Bob's company upon determining that Alice has more than 5 years of sales experience |

Even after carefully reviewing the parties' briefs and the patents, and questioning the

13

parties about Google's hypothetical at the hearing, the Court is unable to discern any reason why, in Google's hypothetical, Carol would not be liable for infringement of Walker's '270 patent. Based on the undisputed evidence, and drawing all reasonable inferences in Walker's favor, the Court concludes that every step of claim 1 of the '270 patent is performed in Google's routine headhunting hypothetical. It follows that all the steps of the '270 patent are routine and unconventional. To allow the claim to survive would disproportionately risk preempting a building block of human interaction, retarding rather than promoting progress, contrary to the very purpose patents are granted. *See* U.S. Const. Art. I § 8 ("The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . .").

The asserted dependent claims of the '270 patent fare no better. Those claims require receiving and storing (claim 2 and 5) and narrowing the scope of a party's demands (claims 10 and 11) – but these additional steps again add no inventive element to the mental processes claimed by the '270 patent. Similarly, the system claims recited in claims 23, 24, 27, 32, and 33 merely take the abstract idea of claims 1, 2, 5, 10, and 11 and list generic computer components (processor, memory) to implement the abstract idea. Even accepting that the use of a computer increases speed and efficiency of performing the steps of the claims, and improves the likelihood of preserving the anonymity of the first and second parties, these characteristics do not save the claims. As the Supreme Court has stated, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." *Alice*, 134 S. Ct. at

14

2358.[5]

Accordingly, the Court will grant Google's motion with respect to Walker's '270 patent.

## II.     '272 Patent

The analysis is largely the same with respect to Walker's '272 patent and the Court

reaches the same conclusions as it did in connection with the '270 patent.  Independent claim 1

of the '272 patent is a method claim; asserted dependent claims 2-4, 9-11, 19, 27, 28, 31, and 32

are also method claims and all depend from independent claim 1.  Independent claim 65 is a

system claim.

Claim 1 recites as follows:

> 1.     A method for facilitating an exchange of information between a first party and a second party, comprising the steps of:
>
> receiving first party information data from said first party;
>
> storing said first party information data in a secure database;
>
> receiving, from said first party, at least one first party rule for releasing said first party information data;
>
> storing said at leas[t] one first party rule;
>
> receiving, from said second party, a search request to the secure database, said search request comprising at least one search criterion to be satisfied;
>
> determining second party data relevant to said at

---

[5]Plaintiff concedes that the system claims merely add generic computer components to the method claims and, therefore, rise and fall with the method claims.  (Tr. at 54)

least one first party rule;

receiving, from said second party, at least one second party
rule for releasing said second party data;

processing said search request from said second
party to determine if said first party information
data satisfies said at least one search criterion;

if said first party information data satisfies said at
least one search criterion, then:

communicating to said second party that said at
least one search criterion has been satisfied;

receiving a request from said second party for said
first party information data;

releasing said second party data pursuant to said
second party rule;

determining, based on said second party data,
whether said at least one first party rule has been
satisfied; and

if said at least one first party rule has been satisfied,
providing, to said second party, said first party
information data for which said at least one first
party rule has been satisfied.

The asserted dependent claims recite:

2.      The method according to claim 1, further
comprising the step of: authenticating authorship of
said first party information data.

3.      The method according to claim 2, wherein the step
of authenticating includes the substep of executing a
cryptographic operation using a cryptographic key.

4.      The method according to claim 2, wherein the step
of authenticating includes the substep of
recognizing an identifier selected from the group

16

consisting of a password, a name, and an identification number.

9. The method according to claim 1, wherein the step of determining second party data further comprising the step of: receiving, from said second party, said second party data corresponding to the second party.

10. The method according to claim 9, further comprising the step of authenticating authorship of the received second party data.

11. The method according to claim 10, wherein the step of authenticating includes the substep of recognizing an identifier selected from the group consisting of a password, a name, and an identification number.

27. The method of claim 1, wherein the first party is a job candidate and the second party is an employer.

28. The method of claim 27, wherein the first party information data comprises at least one of an identity of the job candidate, an address of the job candidate, at least one vital statistic of the job candidate, a description of a work experience of the job candidate, an educational background of the job candidate, an interest of the job candidate, a resume of the job candidate, a list of at least one publication written by the job candidate, and a list of at least one award received by the job candidate.

31. The method of claim 1, wherein the first party and the second party are individuals seeking a personal relationship.

32. The method of claim 31, wherein the first party information data comprises at least one of an identity of the first party, an address of the first party, a vital statistic of the first party, a work experience of the first party, an educational background of the first party, and an interest of the first party.

17

Google contends that, "[a]s with the claims of the '270 patent, the method claims of the '272 patent are likewise patent-ineligible because they are directed to a series of process steps that are unconnected to any particular machine." (D.I. 251 at 12) Unlike claim 1 of the '270 patent, the preamble to claim 1 of the '272 patent does not claim "[a] method for operating a computer system to facilitate an exchange . . . ." Instead, claim 1 of the '272 patent claims "[a] method for facilitating an exchange of information between a first party and a second party." None of the limitations recited in the method claims of the '272 patent recites the use of a machine. The only structural element disclosed in Claim 1 is a "secure database." ('272 patent claim 1) ("receiving, from said second party, a search request to the secure database") However, the "secure database" term has not been construed (no party asked the Court to do so, *see* D.I. 100 at 2) and is given its plain and ordinary meaning, which is not limited to a computer, but may also include, for example, a locked file-cabinet. *See, e.g.*, *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255, 1257 (Fed. Cir. 2012) (stating "database" means "a collection of data within a given structure that can be stored and retrieved," which would include paper filing cabinet).

Similarly, claim 3 recites "executing a cryptographic operation using a cryptographic key," but this process is also not tethered to any computer. "Cryptographic operation" has been construed to mean "operation to encrypt or decrypt data." (D.I. 232 at 1) "Cryptographic key" has been construed to mean "data used as an input to an operation to encrypt or decrypt other data." (*Id.*) "Executing a cryptographic operation using a cryptographic key" would, therefore, include something like the type of substitution cipher one might find in a newspaper (A=T, B=U, etc.). Accordingly, claims 1 and 3 are not tied to a machine and cannot satisfy the machine or transformation test.

18

Plaintiff's expert, Dr. Wills, opines that the '272 patent contains the following

meaningful limitations:

> [1]  receiving party data from a first party and storing it in a secure
> database;
>
> [2] receiving rules from both a first and second party for releasing
> their respective data;
>
> [3] receiving a search request from a second party;
>
> [4] processing the second party's search request to determine if
> party data provided by a first party satisfies the search criterion
> used; and
>
> [5] if the data provided by the first party satisfies the search
> criterion of the second party's search request, the asserted
> independent claims require communicating to the second party that
> at least one search criterion has been satisfied, receiving a request
> from the second party for data provided by the first party, releasing
> the second party's data pursuant to the second party's rule,
> determining whether the first party's rule is satisfied based on the
> second party data, and, if the first party rule has been satisfied,
> providing the first party data to the second party.

(D.I. 283 ¶ 13)  As with the steps of the '270 patent, however, these steps add nothing inventive

to the core concept of anonymously exchanging information about people, a practice that is

described in the patent's specification has having long been practiced by human headhunters and

matchmakers.

As it did with the '270 patent, Google has provided a hypothetical example, shown

below, demonstrating that the limitations of the '272 patent essentially recite an interaction

whereby two parties communicate with a third party and, after some threshold requirements of

both parties are met, the third party releases more information about the two parties to each other,

all of which can be routinely performed by a headhunter:

19

| Limitation of '272 Patent Claim 1 | Routine Steps Performed when Headhunting |
|---|---|
| "receiving first party information data from said first party" | Carol receives a resume from Alice, which lists Alice's college degree, 8 years of sales experience, interests, and other information, including Alice's name |
| "storing said first party information data in a secure database" | Carol stores Alice's resume containing her sales experience information in a locked filing cabinet where Carol keeps files |
| "receiving, from said first party, at least one first party rule for releasing said first party information data" | Alice instructs Carol to disclose her years of sales experience only to employers offering a salary amount of over $75,000 |
| "storing said at leas[t] one first party rule" | Carol stores Alice's instruction in her filing cabinet |
| "receiving, from said second party, a search request to the secure database, said search request comprising at least one search criterion to be satisfied" | Carol receives from Bob a request to search her resume files to find job candidates who have at least 5 years of sales experience |
| "determining second party data relevant to said at least one first party rule" | Carol determines that Bob's salary offer of $100,000 is relevant to Alice's instruction as to whether Alice's years of sales experience may be disclosed |
| "receiving, from said second party, at least one second party rule for releasing said second party data" | Carol receives an instruction from Bob to release his offered salary amount only to candidates with at least 5 years of sales experience |
| "processing said search request from said second party to determine if said first party information data satisfies said at least one search criterion" | Carol reviews Bob's request to determine if Alice's level of sales experience satisfies Bob's requirement of having at least 5 years of sales experience |
| "if said first party information data satisfies at least one search criterion, then communicating to said second party that said at least one search criterion has been satisfied" | Since Alice's experience meets Bob's requirement, Carol tells Bob that she found a candidate with at least 5 years of sales experience |
| "receiving a request from said second party for said first party information data" | Bob asks Carol for the candidate's sales experience |

| "releasing said second party data pursuant to said second party rule" | Carol tells Alice about Bob's salary offer pursuant to Bob's instruction that his salary offer can be disclosed to a candidate with at least 5 years of sales experience |
|---|---|
| "determining, based on said second party data, whether said at least one first party rule has been satisfied" | Based on Bob's salary offer amount, Carol determines whether she can comply with Alice's instruction regarding when to release Alice's years of sales experience |
| "if said at least one first party rule has been satisfied, providing, to said second party, said first party information data for which said at least one first party rule has been satisfied" | Since Bob is offering a salary of $100,000 which satisfies Alice's requirement of a salary offer of at least $75,000 before disclosing Alice's sales experience, Carol provides information about Alice's 8 years of sales experience to Bob |

As with the '270 patent hypothetical, here again Walker has no persuasive response to the

suggestion that Carol is practicing all of the steps of the '272 patent. (*See* Tr. at 37-38)  Because

claim 1 of the '272 patent can be performed entirely in a person's mind using routine and

conventional steps, it is not directed to patentable subject matter. *See CyberSource Corp.*, 654

F.3d at 1373 ("[A] method that can be performed by human thought alone is merely an abstract

idea and is not patent-eligible under § 101.  Methods which can be performed entirely in the

human mind are unpatentable not because there is anything wrong with claiming mental method

steps as part of a process containing non-mental steps, but rather because computational methods

which can be performed *entirely* in the human mind are the types of methods that embody the

'basic tools of scientific and technological work' that are free to all men and reserved exclusively

to none.") (emphasis in original).

The dependent claims add nothing meaningful.  Claims 2, 4, 10, and 11 merely require

confirming that the parties are who they claim to be by, for example, reading their names on their

resumes and comparing them to names on driver's licenses.  Claim 9 requires determining

21

second party data by getting the data from the second party; e.g., Carol receives from Bob information about the $100,000 salary offer for the job available at Bob's company. Claims 27 and 31 simply limit the claimed method to interactions between job candidates and employers and individuals seeking personal relationships, respectively. Claims 28 further defines "first party information data" as comprising fundamental job-seeking information such as the first party's name, address, date of birth, work experience, educational background, personal interest, list of publications, and list of awards. Similarly, claim 32 defines "first party information data" as comprising basic personal information routinely used in matchmaking, including the party's name, address, date of birth, work experience, educational background, and interests. Notably, the patent's specification (like that of the '270 patent) recognizes that these two potential uses for the purported invention (job-hunting and matchmaking) have been practiced for years. (*See* '272 patent col. 2:43-48, 3:48-51)

Claim 3, as discussed earlier, adds the step of using a cryptographic key to execute a cryptographic operation when authenticating the first party's data. These steps can be performed entirely within the human mind. In sum, because the entirety of claim 1 and each of its asserted dependent claims can be performed in a person's mind, and because the claim limitations merely append routine and ordinary steps to an abstract idea, the claims are not directed to patentable subject matter.

Finally, independent claim 65 applies the method disclosed in claim 1 by way of a generic computer with standard computer components including a "memory," a "processor," and "a communication port." None of these components converts a general computer into a specialized computer. As discussed above, merely reciting the use of a generic computer in implementing an

22

unpatentable abstract idea does not inject patentable subject matter into an invention.

## CONCLUSION

It bears emphasis that, as the Supreme Court recently explained in *Alice*, 134 S. Ct. at

2354-55:

> [I]n applying the § 101 exception, [the Court] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more thereby transforming them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws.

Here, Walker contends that the asserted claims of the patents-in-suit "integrate" the

abstract idea of "controlled information exchange between anonymous parties" into "something

more thereby transforming" this building block of human ingenuity into a patent-eligible

invention. However, the Court fails to see anything "more" in the asserted claims than the

abstract idea, implemented in a conventional manner using a general purpose computer, and is

compelled to conclude that the patents risk "disproportionately tying up the use of the underlying

ideas." Accordingly, the asserted claims of the patents-in-suit are invalid due to lack of

patentable subject matter and Google's motion must be granted.

An appropriate Order follows.

23